UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

JOHN E. BOISE, JR.,

                  Plaintiff,

    -v-

CHARTWELL PHARMACEUTICALS LLC,

                  Defendant.

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 05/20/2026

25-cv-8407 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendant Chartwell Pharmaceuticals LLC ("Chartwell" or "Defendant") moves, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss the complaint of Plaintiff John E. Boise, Jr. ("Boise" or "Plaintiff"). Dkt. No. 11. For the reasons that follow, the motion is denied.

## BACKGROUND

The following facts are drawn from Plaintiff's complaint and are accepted as true for the purposes of the present motion. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 34 (2d Cir. 2017).

Chartwell is a FDA-regulated pharmaceutical company with its principal place of business in Congers, New York. Dkt. No. 1 ¶¶ 2, 6. Boise is an experienced and highly trained maintenance and engineering executive. *Id.* ¶ 6. Boise was hired by Chartwell as an employee on or about October 18, 2021. *Id.* ¶ 7. He reported to and was supervised by Eric Farkas ("Farkas"), Vice President of Engineering and Maintenance. *Id.* ¶ 8. In turn, Farkas reported to Jack Goldenberg ("Goldenberg"), a managing member of Chartwell. *Id.* ¶ 9; *see also* Dkt. Nos. 26-3, 26-4.

While he was employed by Chartwell, Boise personally observed that Chartwell engaged in business and manufacturing processes that violated 21 C.F.R. Parts 210 and 211, Good

Manufacturing Practice, as well as other laws, involving adulterated, contaminated and mislabeled pharmaceuticals. *Id.* ¶ 10. Chartwell engaged in illegal "debulking" operations, whereby expired products were openly repackaged with new labels and expiration dates without testing, compromising the integrity and purity of the products. *Id.* ¶¶ 11–17.[1] Boise "repeatedly complained about this illegal debulking operation." *Id*. ¶ 18. Chartwell also uses contaminated ingredients in its production operations, in violation of Current Good Manufacturing Practice ("cGMP") as outlined by the FDA. *Id.* ¶ 22.[2] Chartwell collects product waste in vacuums, in dust collectors, off machine services, and off the floor, and then reintroduces this waste into batches, often without additional processing, causing the batches to become contaminated. *Id.* ¶ 23. Boise "repeatedly complained about these unsafe and illegal manufacturing practices to Farkas who failed to address them." *Id.* ¶ 24.

While employed at Chartwell, Plaintiff hired an experienced mechanic, Christian Pasciolla ("Pasciolla"), who, in his first week of work, observed an employee scoop product off the floor and put it directly back into the batch blender. *Id.* ¶ 26. Pasciolla complained to Boise about the incident and quit on the spot. *Id.* ¶ 27. When Boise informed Farkas of the situation, he responded to the effect of "it was what it is; we don't own the company. Jack [Goldenberg] does." *Id.* ¶ 28.

In another operation, Chartwell repackaged amoxycillin at night in the warehouse and then, a few days later, performed a clinical trial on its baby formula in the same warehouse

---

[1] Plaintiff alleges, on information and belief, that the FDA investigated Chartwell for having products with the same lot number but different expiration dates, a byproduct of debulking, after a customer complained about expired drugs. *Id.* ¶¶ 20, 21.

[2] Current Good Manufacturing Practice regulations are regulations enforced by the FDA. *See Kouyate v. Harvard Drug Grp. LLC*, 2025 WL 2773159, at *7 (S.D.N.Y. Sept. 26, 2025) ("the [cGMPs] are 'standards' that are 'designed to insure the production of unadulterated drugs.'") (quoting *Nutritional Health All. v. Food & Drug Admin.*, 318 F.3d 92, 100 (2d Cir. 2003)).

without any cleaning or decontamination, thus risking contamination of the baby formula. *Id.* ¶ 29.  This conduct violated cGMP and placed the adolescent participants' health at risk. *Id.* ¶ 30.  Chartwell also disposes of its hazardous waste directly into the regular commercial waste stream. *Id.* ¶ 31.  Chartwell also releases alcohol fumes directly into the air. *Id.* ¶ 32.  Chartwell also uses contaminated uniforms, moves equipment back and forth between manufacturing sites without cleaning, and improperly stores capsules, ingredients, and products. *Id.* ¶¶ 36–38.  These practices violate local, state, and federal law. *Id.* ¶¶ 29–32, 34.  "Boise's complaints to Mr. Farkas about these business practices were ignored and went unaddressed." *Id.* ¶ 39.

In December 2024, the FDA audited Chartwell for pre-approval of the amoxicillin plant. *Id.* ¶ 40.  During the audit, the FDA requested certain documents from Chartwell that did not exist. *Id.* ¶ 41.  Goldenberg directed Boise to fraudulently create and backdate those documents to satisfy the request, which Boise refused. *Id.* ¶¶ 42–43.  Shortly after that incident, Boise noticed that the capsule polisher and metal detector in the amoxicillin plant packaging line had been removed to speed up production, in violation of FDA regulations. *Id.* ¶ 44.  Boise reported this illegal modification to Farkas, who failed to address it. *Id.* ¶ 45.  A few days later, Boise was ordered to Goldenberg's office and told "to mind his own business and let the quality department be responsible for the violations." *Id.* ¶ 46.  In or around March 2025, Chartwell terminated the employment of Boise's daughter. *Id.* ¶ 52.

On April 22, 2025, Chartwell terminated Boise's employment, ostensibly due to a restructuring that eliminated his job. *Id.* ¶ 48.  However, following his termination, Boise was replaced by another employee who assumed his duties and responsibilities, and no other employees were terminated at the same time as Boise. *Id.* ¶¶ 49–50.  At the time of Boise's termination, there were no performance issues to justify the employment action. *Id.* ¶ 51.

Following his termination, Boise was contacted on several occasions by an attorney for Chartwell to discuss a severance. *Id.* ¶ 53. During those discussions, Chartwell's attorney told Boise that Chartwell performed a due diligence investigation of Boise's employment after his termination and claimed that Boise had made an inappropriate comment about one employee to another employee who taped the call. *Id.* ¶ 54.

## PROCEDURAL HISTORY

Plaintiff initiated this case by complaint on October 10, 2025, bringing a claim under New York Labor Law § 740(2)(c) for retaliatory termination. Dkt. No. 1.

On January 14, 2026, Defendant filed this motion to dismiss, Dkt. No. 11, accompanied by a memorandum of law in support of its motion, Dkt. No. 12. Plaintiff filed its memorandum of law in opposition to the motion to dismiss on March 6, 2026. Dkt. No. 20. Defendant replied with a memorandum of law in further support of its motion on April 15, 2026. Dkt. No. 24.[3]

## LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(1), "the plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence." *Dukes v. N.Y.C. Emps. Ret. Sys.*, 361 F. Supp. 3d 358, 363 (S.D.N.Y. 2019) (citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "In considering such a motion, the Court generally must accept the material factual allegations in the complaint as true." *Id.* (citing *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d

---

[3] On May 4, 2026, the Court ordered Plaintiff to show cause why his action should not be dismissed for failure to plead diversity of citizenship sufficient to support subject-matter jurisdiction. Dkt. No. 25. Plaintiff timely replied on May 11, 2026, pleading that he is a citizen of New Jersey and that Goldenberg, a member of Defendant, is a citizen of New York, therefore making Defendant, as a limited liability company, a citizen of New York. Dkt. No. 26; *see Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012). The Court therefore "deem[s] the pleadings amended so as to properly allege diversity jurisdiction." *Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 64 (2d Cir. 2009).

107, 110 (2d Cir. 2004)).  The Court does still, though, "draw all reasonable inferences in favor of the party asserting jurisdiction."  *Quiroz v. Beaverton Foods, Inc.*, 2019 WL 1473088, at *2 (E.D.N.Y. Mar. 31, 2019) (quoting *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)).

On a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff.  *See York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir.), *cert. denied*, 537 U.S. 1089 (2002).  This requirement "is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  A complaint must offer more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).  The ultimate question is whether a "claim has facial plausibility," which is established where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting the claim.  *Twombly*, 550 U.S. at 556; *see Mattrixx Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

Defendant argues that the complaint should be dismissed for lack of subject matter jurisdiction because Plaintiff does not properly plead an amount in controversy in excess of

$75,000 sufficient to support diversity jurisdiction, Dkt. No. 12 at 12–15, and for failure to state a claim for relief because Plaintiff does not plead a causal link between his alleged protected activity and an adverse employment action, *id.* at 8–12.  Neither argument has merit.

## I.    Diversity Jurisdiction - Amount in Controversy

Section 1332(a) of Title 28 vests the federal courts with jurisdiction of civil actions between citizens of different states "where the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs."  28 U.S.C. § 1332(a).  "[T]he sum claimed by the plaintiff controls if the claim is apparently made in good faith."  *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938).  The Second Circuit "recognizes a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy."  *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999).  A "plaintiff need not allege a specific number to meet the [amount-in-controversy] threshold."  *Kwolek v. NRT New England LLC*, 2023 WL 7282364, at *3 (D. Conn. Nov. 3, 2023).  The plaintiff need only show that there is a "reasonable probability" that the action exceeds the jurisdictional threshold.  *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994).  A defendant may rebut that presumption by demonstrating "to a legal certainty that the plaintiff could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums."  *Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006).  "The Second Circuit has 'set a high bar for overcoming this presumption.'"  *Lujan v. Sensio Co. (US) Inc.*, 2025 WL 834835, at *3 (S.D.N.Y. Mar. 14, 2025) (quoting *Scherer v. Equitable Life Ass. Soc'y of the U.S.*, 347 F.3d 394, 397 (2d Cir. 2003)).  "'[T]he legal impossibility of recovery must be so certain as virtually to negative the plaintiff's good faith in asserting the claim.'"  *Id.* (quoting *Scherer*, 347 F.3d at 397).

Plaintiff has pleaded that the Court has diversity jurisdiction over his action pursuant to

28 U.S.C. § 1332(a)(1) because he and Defendant are citizens of different states (New Jersey and New York, respectively) and because the amount in controversy exceeds the sum or value of $75,000. Dkt. No. 1 ¶ 3; *see also* Dkt. No. 26 ¶¶ 4–9. Although Plaintiff does not specify a specific amount he seeks in damages, the allegations of his complaint plausibly suggest that it is well in excess of $75,000. Plaintiff was an experienced and highly trained maintenance and engineering executive. *Id.* ¶ 6. He was fired after three and a half years of employment by Defendant. *Id.* ¶¶ 7, 52. Plaintiff alleges that Defendant willfully terminated him to prevent him from reporting or otherwise interfering with Defendant's unlawful and unsafe manufacturing practices. He alleges an egregious set of facts about conduct that could have caused public harm, including contaminated and adulterated batches of pharmaceutical products. *Id.* ¶¶ 23, 29, 31–32, 36–38. As relief, he seeks compensatory damages, including back pay and front pay, and damages for physical injury, loss of reputation and career loss, and uncapped punitive damages. Dkt. No. 1 at 8; *see also* NYLL § 740(5)(a)–(g) (permitting recovery of "compensation for lost wages, benefits and other remuneration," "a civil penalty of an amount not to exceed ten thousand dollars," and "the payment by the employer of punitive damages, if the violation was willful, malicious, or wanton.").

"If Plaintiff were to succeed in these allegations, it is clearly plausible that her compensatory and punitive damages would exceed $75,000." *Major v. Diageo N. Am., Inc.*, 2022 WL 2003490, at *2 (S.D.N.Y. June 6, 2022); *see Hager v. Steele*, 2020 WL 4345735, at *2 (S.D.N.Y. July 29, 2020) (on wrongful discharge claim, looking at the Plaintiff's position and the length of time for which he sought back and front pay, in finding that, "without considering the potential compensatory or punitive damages sought," that the amount in controversy requirement was met); *Dill v. Ron's Gold Car Rental, Inc.*, 2013 WL 3716382, at *4 (D. Conn. July 12, 2013)

7

(considering future lost wages even where "it is far from clear at this stage whether plaintiffs will be able to prove the future earnings they claim."); *Safraz v. Vohra Health Servs., PA*, 663 F. Supp. 2d 147, 151 (E.D.N.Y. 2009) (finding it "entirely plausible" that a physician would lose "more than $75,000 in salary" per year). Tellingly, Defendant has offered no facts to rebut the presumption of good faith. Defendant has therefore not shown that it is a "legal impossibility" that Plaintiff could recover a value in excess of the amount in controversy requirement under 28 U.S.C. § 1332. *See Zacharia v. Harbor Island Spa, Inc.*, 684 F.2d 199, 202 (2d Cir. 1982) (explaining that "even where [the] allegations leave grave doubt about the likelihood of recovery of the requisite amount, dismissal is not warranted.").

## II.    Failure to State a Claim for Relief- Causal Link

Defendant next argues that Plaintiff has not stated a claim for violation of New York Labor Law § 740(2)(c) because he has not pleaded facts to establish that his employment was terminated because of his protected activity. Dkt. No. 12 at 8–12. Defendant argues that Plaintiff did not plead "(1) facts to support his claim that Chartwell made the determination to terminate his employment based on his alleged objections or refusals to participate in certain activities or policies; or (2) facts to demonstrate that his termination occurred in close proximity to his alleged protected activities." *Id.* at 8.

New York Labor Law § 740(2)(c) prohibits an employer from taking retaliatory action against an employee who "objects to, or refuses to participate," N.Y. Lab. Law § 740(2)(c), in any "activity, policy, or practice of the employer that the employee reasonably believes is in violation of law, rule, or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health and safety," *id.* § 740(2)(a). "To plead a violation of Section 740, a plaintiff must allege: '(1) a retaliatory action, (2) an activity protected by the statute, and (3) a causal link between the two.'" *Delaney v. HC2, Inc.*, 761 F. Supp. 3d 641, 676

(S.D.N.Y. 2025) (quoting *Pierce v. Better Holdco, Inc.*, 2023 WL 6386920, at *4 (S.D.N.Y. Sept. 29, 2023)).  "Causation can be supported at the pleading stage with allegations of (i) 'direct evidence of retaliatory animus' or (ii) indirect evidence of causation 'through temporal proximity to the protected activity' or 'a backdrop of continuing antagonism and frustration of professional ambitions.'"  *Pardo v. Tomas Infernuso DVM, P.C.*, 2024 WL 4276204, at *6 (E.D.N.Y. Sept. 24, 2024) (quoting *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018)).

Plaintiff has alleged facts that can reasonably give rise to an inference of retaliatory action.[4]  Plaintiff alleges that he objected to Defendant engaging in debulking operations, using contaminated pharmaceutical ingredients, improperly disposing of waste, using dirty uniforms and equipment without regard for cross-contamination, lying to the FDA, and cutting corners on the production line.  Dkt. No. 1 ¶¶ 11–45.  Plaintiff alleges that he orally made these objections and reported these violations to Farkas, Plaintiff's supervisor, and Goldenberg, Plaintiff's employer.  *Id.* ¶¶ 18, 24, 28, 33, 39, 43, 45–46; *see Esmilla v. Cosmopolitan Club*, 936 F. Supp. 2d 229, 239 (S.D.N.Y. 2013) (finding that "the New York Labor Law's anti-retaliation provision unquestionably protects informal complaints made to an employer") (quoting *Duarte v. Tri-State Physical Med. & Rehab., P.C.,* 2012 WL 2847741, at *3 (S.D.N.Y. Jul. 11, 2012)).  He also alleges that, when he reported corner-cutting on the production line to Farkas, he was told by Goldenberg to "mind his own business[.]"  Dkt. No. 1 ¶ 46.  Plaintiff also alleges that three months after he made that report and was told to mind his own business, *id.* ¶ 44–47, Defendant terminated the employment of his daughter, ¶ 52 and, one month later, on April 22, 2025,

---

[4] New York courts recognize that a claim for retaliation under Section 740 involves much of the same standards and analysis as claims for retaliation under the state Human Rights Law, which in turn involves standards and analysis almost identical to those for claims for retaliation under federal law. *See Paquette v. Ramsammy*, 239 N.Y.S.3d 816 (Table), at *12 (Sup. Ct. Alb. Cnty. 2025).

Defendant terminated his employment, *id.* ¶ 48. He further alleges facts that suggest that the rationale he was given for his termination was pretextual. He was told he was terminated because his job was eliminated during corporate restructuring, but he was the only employee fired and his position was not eliminated but filled by another employee. *Id.* ¶¶ 49–50

Defendant argues that Plaintiff fails to state a claim for retaliation under Section 704 because Plaintiff's "alleged protected activities and [Plaintiff's] termination . . . were not in close proximity under the Second Circuit's standard." Dkt. No. 12 at 14. This Court previously has recognized that "'district courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation.'" *Accettola v. He*, 2025 WL 843412, at *10 (quoting *Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *21 (E. D.N.Y. Apr. 19, 2007) (Bianco, J.) (collecting cases). In that same case, however, the Court also qualified that there is no hard-and-fast temporal rule regarding causation. *Cf. Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) ("we have not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship . . . [which] has allowed our Court to exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases."). There may exist "factors [that] suggest that the Court should infer causation from a longer time frame." *Id.* (citing *Bamba v. U.S. Dep't of Homeland Sec.*, 2024 WL 3924810, at *19 (S.D.N.Y. Aug. 23, 2024)); *accord McConkey v. Churchill Sch. & Ctr.*, 2025 WL 2062195, at *14 (S.D.N.Y. July 23, 2025). To that end, "courts in this circuit have held that a period of four months is sufficient temporal proximity to plausibly find a causal connection." *Wooding v. Winthrop Univ. Hosp.*, 2017 WL 2559942, at *15 (E.D.N.Y. Jun. 12, 2017). Depending on the circumstances, "five months [may not be] not too

10

long [in between an alleged protected action and an adverse action] to find the causal relationship." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (citing *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)).  Importantly, "where temporal proximity is not the only evidence that bears on a causal connection," that is, when direct evidence of retaliation may exist, "the lapse in time between the protected activity and the adverse action can be longer." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 277–78 (2d Cir. 2023).

That is the case here: Goldenberg's comment to Plaintiff for him to "mind his own business" and discrepancies in Defendant's reasoning for terminating Plaintiff, if true, would all be direct evidence of retaliation.  Those allegations provide a basis beyond just "temporal proximity" upon which Plaintiff's retaliation claim is premised.  *See Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007); *see Trotter v. Nat'l Football League*, 737 F. Supp. 3d 172, 190 (S.D.N.Y. 2024) (finding that a confrontation in which plaintiff was asked whether he was "in alignment" with the defendant before terminating him "directly suggest[ed] a retaliatory animus").  A pleading of four months in between an alleged protected action and an adverse action can generally suggest retaliation, and especially so when, like in this case, there are other facts that support an inference of retaliation.

## CONCLUSION

Defendant's motion to dismiss is denied.  The Clerk is respectfully directed to close Dkt. No. 11.

SO ORDERED.

Dated: May 20, 2026
   New York, New York                                         LEWIS J. LIMAN
                                                       United States District Judge

11